**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BRANT W. SCOTT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08 C 4908 |
| | ) | |
| BNSF RAILWAY COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Before the court is the motion of defendant BNSF Railway Company ("BNSF") for summary judgment, which is denied for the reasons explained below.

**BACKGROUND**

Plaintiff, Brant W. Scott, has been employed by BNSF, a corporation that operates a railroad as a common carrier in interstate commerce, since 1969. He brought this lawsuit for a shoulder injury he allegedly sustained on September 9, 2006 while working as a conductor/brakeman on a train. The train was scheduled to travel from Eola, Illinois (which is between Naperville and Aurora) west to Mendota, Illinois. Scott's fellow crew members that day were Tom Lynch, a conductor, and Art Williams, the engineer. Trainmaster Alex Viel rode along with the crew.

After Scott reported to work at the Eola rail yard, a job briefing was conducted about the day's work and safety. After the

briefing, the crew got on their engine and went to the east rail yard to assemble their train. After putting the train together and performing tests, they left Eola to make railcar deliveries.

The crew planned to use a certain spur track to store a single railcar for another train to pick up and take further west. At the spur, Scott got off the train and told Williams to pull ahead some distance and then stop. Scott then got permission to move between the train cars and pulled the uncoupling pin in order to "cut" the railcar away from the rest of the train. After this cut, just the single car that was going to be moved onto the spur was attached to the engine. Lynch, who manned the "head switch," unlocked the switch at the unlock box, and Scott put a hand brake on the train to keep it from rolling.

Then, Scott walked over to the device that is central to this case--the "derail," which, as the name suggests, derails equipment that moves through it. The derail was made of painted steel and manually operated. It was attached, with spikes driven through plates, to railroad ties that abutted the track. The plan was that Scott would unlock the derail, "throw" it (i.e., move it to the open position with a handle that is attached to a rod), and wait for the engine to move the railcar to him. He would then stop the railcar east of the derail and cut it away from the engine by pulling the pin, and send the engine back out of the spur. To prevent the railcar from rolling away, he would apply a hand brake,

and then put the derail back "on" (i.e., move it to the closed position) and lock it.  Lynch would then send the engine back to Scott, who would re-couple the train, release the hand brake, and get back on the engine to travel to the next work site.

The *opening* of the derail, at least, went as planned.  Scott approached the derail, looked at it to confirm that no one had tampered with it, unlocked the derail, and removed the lock.  Then he grabbed the handle of the device with both hands, lifted it up, and moved the handle in the opposite direction, to the west.  (The handle is initially easy to lift, but the move becomes progressively more difficult as the handle moves from east to west and the derail is opened.)  After opening the derail, Williams moved the engine and railcar over the spur section of the track, east of the derail.  When the engine was stopped, Scott detached the railcar from the engine and gave Lynch a signal to move the engine back through the derail area and out of the spur.  Scott then secured the railcar with a hand brake.

In his attempt to close the derail, Scott encountered a problem that allegedly caused him injury.  He walked over to the derail to close it, putting his right foot on the ballast on the west side of the west railroad tie and his left foot on the ballast east of that tie.  While in a "catcher's squat," he began to lift the handle with both hands and turn it back from west to east.  Suddenly, the west plate of the derail popped up three inches, and

all three spikes came out of the tie. While Scott's momentum continued to move the handle of the derail, the tips of the three spikes momentarily "caught," and then the entire base of the derail (both plates and all six spikes) jerked upward and became completely detached from the railroad ties. Scott stumbled, let go of the handle, and grabbed his shoulder in pain. He claims that his resulting shoulder injury eventually required surgery and caused him to miss nine months of work.

Scott asserts a claim against BNSF for violation of the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 et seq., which holds railroads liable for employees' injuries "resulting in whole or in part from the [carrier's] negligence." BNSF moves for summary judgment.

## DISCUSSION

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering such a motion, we construe the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. See Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Summary judgment should be denied if the dispute is 'genuine': 'if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Talanda v. KFC Nat'l Mgmt. Co.</u>, 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." <u>McGrath v. Gillis</u>, 44 F.3d 567, 569 (7th Cir. 1995).

The Seventh Circuit has outlined the purpose of the FELA and a FELA plaintiff's summary-judgment burden as follows:

> The intent of the FELA is to provide broad remedial measures for railroad employees. A railroad will thus be held liable if the employer's negligence played any part, even the slightest, in producing the injury. A plaintiff's burden in an FELA action is therefore significantly lighter than it would be in an ordinary negligence case. Indeed, some of our cases have noted examples of FELA cases submitted to juries based upon evidence "scarcely more substantial than pigeon bone broth." As light as this burden is, the plaintiff must still present some evidence of negligence in order to survive a motion for summary judgment. Specifically, the plaintiff must offer evidence creating a genuine issue of fact on the common law elements of negligence, including duty, breach, foreseeability, and causation.

<u>Green v. CSX Transp., Inc.</u>, 414 F.3d 758, 765-66 (7th Cir. 2005) (citations and footnote omitted). "The FELA holds railroads to a prudent-person standard of care, and a plaintiff who wishes to demonstrate that a railroad breached its duty must show circumstances that 'a reasonable person would foresee as creating

a potential for harm.'" <u>Williams v. Nat'l R.R. Passenger Corp.</u>, 161 F.3d 1059, 1062 (7th Cir. 1998) (citation omitted).

In its motion, BNSF argues that Scott has failed to produce evidence that the company was negligent, focusing on the element of foreseeability. BNSF contends that there is no evidence that it had actual or constructive knowledge of any defect "of the nature that caused [Scott's] claimed injury." (Def.'s Mem. at 3.) BNSF notes that it is undisputed that plaintiff had operated the derail during the month before the accident (as well as minutes before the accident) and that it had operated properly, and it cites plaintiff's deposition testimony in which he conceded that prior to his operation of the derail, nothing looked out of the ordinary, and that he did not "take exception to the way the ties were." (Def.'s R. 56.1 Statement, Ex. C, Dep. of Brant Scott, at 41-42.)[1]

---

[1] This portion of questioning, regarding the condition of the railroad ties and derail when plaintiff first approached the area, was awkwardly phrased:

Q. Did you inspect the ties that the derail was on?
A. Yes.
Q. What did you see there? Did you take exception to the way the ties were?
A. No.
Q. Did you take exception to the condition of the derail?
A. No.

(Scott Dep. at 42.) Later in the deposition, clearer questions were asked regarding the condition of the ties and derail when Scott again approached the derail to close it:

Q. When you went back to the derail the second time to close it, to take it from west to east, did you inspect the derail again for any defects?
A. Yes.
Q. Did you inspect the ties for any defects?
A. Yes.
Q. Did you find any defects in either the derail or the ties?
A. Nothing out of the ordinary.

(Scott Dep. at 59.)

BNSF also cites plaintiff's deposition testimony that he and his co-workers had never seen a derail of the same type come out of railroad ties before.  Regarding plaintiff's theory that the holes for the derail spikes in the railroad ties had become enlarged over time to the point that they no longer held the spikes (and thus the derail) in place, BNSF emphasizes that plaintiff conceded that a visual inspection would not have enabled anyone to discover enlarged holes.  (Scott Dep. at 117.)  BNSF also argues that there is no evidence that it performed track inspections "contrary to any standards."  (Def.'s Mot. at 6.)

Scott asserts that BNSF failed to use proper care to discover the deterioration in the railroad ties and repair the defect.  It is undisputed that BNSF is required to conduct periodic inspections on its track and that track "other than main tracks and sidings," which is evidently the type involved here, should be inspected "[m]onthly with at least 20 calendar days interval between inspections."  49 C.F.R. § 213.233(c).  Scott admitted at his deposition that the allegedly enlarged spike holes were not visible, but testified that track inspectors could have put a "track bar" underneath the derail and tugged at the bar to check to see if the derail was properly attached to the ties.  He also testified that he has seen BNSF employees perform this type of test on derails.  (Scott Dep. at 92, 94-95.)

In support of his argument that BNSF had a reasonable way of knowing that a potential hazard existed, Scott primarily points to photographs that were taken on the day of the incident of the derail and the railroad ties to which it was attached, and contends that the ties were "rotten, not in proper condition, and would not hold the derail." (Pl.'s Mem. in Opp'n at 4.) According to Scott, "[i]t takes years for these ties to rot, and any track inspector would be able to tell these ties were old and should be replaced." (Pl's Mem. in Opp'n at 5.) The photographs taken on September 9, 2006, Ex. 4 to plaintiff's memorandum, do show a number of large splits and cracks in the ties, some of which passed through the same area as the spikes that held the derail. Scott also cites the deposition testimony of Gregg Konecny, a superintendent of operations for BNSF, who agreed that "it takes months or years" for a railroad tie to rot or for spikes to work themselves out of a tie. (Pl.'s Mem. in Opp'n, Ex. 2, Dep. of Gregg Konecny, at 19-21.)

In addition, Scott points to the accident report that his immediate supervisor, Alex Viel, completed on the day of the incident indicating that a track defect contributed to Scott's alleged injury. On page 4 of Viel's "Supervisor's Report of BNSF Employee Injury/Illness," in the section titled "Injury Information," the form requires a "Probable Cause/Circumstance Code." Viel used the code "6C," which falls into the "Track

(Defective)" category of probable-cause codes listed on page 12 of

the report.  (Pl.'s Mem. in Opp'n, Ex. 1.)  Scott also cites his

own deposition testimony concerning a statement that the track

inspector, Jim Ashlock, made to him after the incident:

> Q.  Are you aware of anyone else inspecting the derail after
> you left?
> A.  Yes.
> Q.  Who is that?
> A.  Jim Ashlock and Tom Travelstead and his crew.
> . . .
> Q.  Who is Jim Ashlock?
> A.  He's the track inspector.
> . . .
> Q.  To your knowledge did they fix the derail?
> A.  Yes.
> . . .
> Q.  Did you ever have any conversations with Mr. Ashlock about
> this event?
> A.  Afterwards?
> Q.  Yes.
> A.  Yes.
> Q.  What did you say?
> A.  I asked him what he found.
> Q.  What did he say?
> A.  He said the holes weren't going to hold the spikes, they
> were wore out.

(Scott Dep. at 69-71.)

BNSF objects to the testimony regarding Ashlock's statement as

inadmissible hearsay.  The objection is overruled because the

statement constitutes an admission by an opposing party under

Federal Rule of Evidence 801(d)(2).  BNSF also objects to the

affidavit submitted by Scott in response to BNSF's motion, in which

Scott states that in his deposition, when he testified that he did

not take exception to the railroad ties and that nothing looked

"out of the ordinary" at the derail, what he meant was that he

frequently saw old and worn-out ties; he was not stating that
nothing was wrong with them, that they were safe, or that they were
in proper condition. (Pl.'s Mem. in Opp'n, Ex. 5, Aff. of Brant W.
Scott ¶¶ 7-8.)  BNSF argues that the affidavit contradicts Scott's
prior deposition testimony and should be disregarded as a sham.

The Seventh Circuit has "long followed the rule that parties
cannot thwart the purposes of Rule 56 by creating 'sham' issues of
fact with affidavits that contradict their prior depositions." Bank
of Illinois v. Allied Signal Safety Restraint Sys., 75 F.3d 1162,
1168 (7th Cir. 1996).  "When a party has given clear answers to
unambiguous questions which negate the existence of any genuine
issue of material fact, that party cannot thereafter create such an
issue with an affidavit that merely contradicts, without
explanation, previously given clear testimony." Id. at 1170
(quoting Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc., 736
F.2d 656, 657 (11th Cir. 1984)).  The rule "serve[s] an important
purpose of weeding out non-meritorious claims for which a trial is
not necessary . . . . [but] must be applied with caution." Flannery
v. Recording Indus. Ass'n of Am., 354 F.3d 632, 638 (7th Cir.
2004).  In light of the jury's role in resolving questions of
credibility,

> [a] definite distinction must be made between
> discrepancies which create transparent shams and
> discrepancies which create an issue of credibility or go
> to the weight of the evidence. . . . To allow every . .
> . variation in a witness's testimony to be disregarded as
> a sham would require far too much from lay witnesses and

> would deprive the trier of fact of the traditional
> opportunity to determine which point in time and with
> which words the witness . . . was stating the truth.
> Variations in a witness's testimony . . . throughout the
> course of discovery create an issue of credibility as to
> which part of the testimony should be given the greatest
> weight if credited at all.

Bank of Illinois, 75 F.3d at 1169-70 (quoting Tippens v. Celotex

Corp., 805 F.2d 949, 953-54 (11th Cir. 1986)). Stated a bit

differently, the assessment is "whether a subsequent statement so

squarely contradicts an earlier one as to create only a sham issue

of fact." Bank of Illinois, 75 F.3d at 1170. A "contradiction"

exists only when the two statements are "inherently inconsistent"

and not when the later statement merely clarifies an earlier

statement that is ambiguous or confusing or is based on newly

discovered evidence. See Flannery, 354 F.3d at 638; Bank of

Illinois, 75 F.3d at 1171-72.

We have reviewed plaintiff's deposition testimony, and we do

not believe that his affidavit squarely contradicts that testimony.

True, Scott stated repeatedly that nothing looked out of the

ordinary at the derail and that he did not "take exception to" (an

inartful phrase repeatedly used by defendant's counsel, see supra

n.1) the condition of the derail or the railroad ties. He also,

however, testified that he believed that the holes for the spikes

"had wore out" and had become too large and that he believed that

the derail had not been regularly inspected as required. (Scott

Dep. at 74, 91-92.) It is also true that Scott did not testify

that the railroad ties were rotted, but we do not find this
omission renders the affidavit a "sham." Scott's argument that the
ties were rotted is *consistent with* his deposition testimony that
he believed that the spike holes had become enlarged. In other
words, "enlarged spike holes" and "rotted ties" are not mutually-
exclusive theories. We would characterize the allegedly enlarged
spike holes as the purported defect, and the condition of the ties
as the circumstances that possibly created a potential for harm.
See Geraty v. Ne. Ill. Regional Commuter R.R. Corp., No. 06 CV 815,
2009 WL 691280, at *8 (N.D. Ill. Mar. 16, 2009) (in a FELA case,
noting that "when a defect is hidden from view, the potential for
harm is less foreseeable. But when the circumstances that create
the potential for harm are in plain view, foreseeability is more
easily established") (citations omitted). Moreover, Scott does not
rely solely on his own testimony for the proposition that the ties
were rotted; he relies in large part on photographs that arguably
show that the ties were in poor condition. He provides suitable
explanations regarding his statements that he saw nothing "out of
the ordinary" and did not "take exception" to the condition of the
derail or ties. The variations in Scott's testimony create an
issue of credibility that BNSF will be free to point out at trial,
but they do not rise to the level of inherent inconsistencies that
require us to disregard his affidavit.

Given the "plaintiff-friendly" nature of the FELA, <u>Kossman v. Northeast Illinois Regional Commuter Railroad Corp.</u>, 211 F.3d 1031, 1036 (7th Cir. 2000), and the fact that we must draw all reasonable inferences in plaintiff's favor, we conclude that the evidence--the photographs of the ties and derail, Viel's report, Ashlock's statement, and plaintiff's testimony--prevents us from entering summary judgment in BNSF's favor.  The evidence is sufficient to suggest that BNSF had at least constructive notice of a defective condition in the ties.  BNSF makes much of plaintiff's failure to present expert testimony regarding track inspections or the state of the railroad ties, but we are unpersuaded.  The type of negligence alleged here and its connection to the alleged injury is within the common knowledge of a layperson.

## CONCLUSION

For the foregoing reasons, the motion of BNSF Railway Company for summary judgment [60] is denied.  A status hearing is set for May 9, 2012 at 10:30 a.m. to set a trial date.


DATE:     April 20, 2012



ENTER:    _____

John F. Grady, United States District Judge